UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Docket no. 2:16-cr-94-GZS |
| LUIS MEDINA, | ) |
| | ) |
| Defendant. | ) |

ORDER ON MOTION TO SUPPRESS

Before the Court is Defendant Luis Medina's Motion to Suppress (ECF No. 34). The Court held an evidentiary hearing on March 17, 2017. After considering the evidence and arguments presented at the hearing, as well as the Government's Response in Opposition (ECF No. 38), the Court DENIES the Motion for the reasons explained below.

I.      FACTUAL FINDINGS

The following facts are drawn from the record in this case, including the testimony of Troopers O'Leary and Dupont at the evidentiary hearing on the motion. The incident underlying Defendant's Motion arose from an ongoing investigation into fraudulent driver's licenses in New Hampshire. Specifically, an employee of the New Hampshire Division of Motor Vehicles (DMV) allegedly took cash bribes to supply fraudulent licenses to persons using false supporting documents. In April 2016, New Hampshire State Trooper James O'Leary, who was assigned to investigate these fraudulent licenses, first identified a potential fraudulent license in the name of "Miguel Roldan" with a Manchester, New Hampshire, address. Using the telephone number on Roldan's license application, O'Leary performed an open source search and found the Facebook

page of a "Lima Medina," from the Dominican Republic.[1]  The Facebook page was in English and included a photograph depicting a man standing next to the rear of a vehicle registered in New Hampshire to Miguel Roldan.  (See Hr'g Ex. 1.)

On April 22, 2016, O'Leary received word from DMV personnel that "Miguel Roldan" had come into the DMV office in Manchester in an attempt to renew his license or registration.  O'Leary and another State Trooper, Richard Dupont, headed in separate vehicles to the Manchester DMV office with the intent of making contact with Roldan.  Both troopers were in uniform with visible, holstered weapons.  O'Leary drove a marked cruiser and Dupont was in an unmarked vehicle.  While en route, at about 3:00 p.m., O'Leary looked to his left at an intersection in Manchester and spotted the man in the Facebook photo stopped at an opposite traffic light in a Honda Odyssey minivan.[2]  O'Leary made a U-turn, drove up behind the minivan, activated his flashing lights, and pulled the minivan over into the parking lot of a Friendly's restaurant.  Dupont followed directly behind.

O'Leary approached the minivan and asked the driver, in English, to shut off the engine and step out.  When the driver complied, O'Leary, again in English, asked him his name, and the man verbally identified himself as Miguel Roldan.  The man was in fact the Defendant, Luis Medina.  O'Leary was certain that this was the man depicted on the Facebook page.  O'Leary also noted that Medina appeared to be in very good physical shape.

O'Leary placed Medina in handcuffs, explaining to him in English that he was not under arrest and was only being detained.  He asked Medina in English if he understood, and Medina said that he did.  Dupont approached while Medina was being handcuffed, checked him for

---

[1] The record is silent as to whether "*Lima* Medina" is a known alias or nickname for "*Luis* Medina."

[2] This was a different vehicle than the one depicted on the Facebook page.

weapons, and found none.  Dupont also asked Medina in English if he understood that he was not under arrest, and Medina answered, "Yes."  O'Leary asked him in English if he had ever been arrested before, and he answered, "No."  At some point during these initial interactions, two plainclothes Manchester detectives who happened to witness the stop exited an unmarked cruiser and approached the scene.

O'Leary returned to his cruiser to contact an interpreter, because he believed that further questioning would best be conducted in Spanish, and to ask a U.S. Immigration and Customs Enforcement (ICE) Officer, Joseph Anoli, to respond to the scene.  Meanwhile, one of the Manchester police officers asked Medina in English if he had a driver's license or other identification.  Medina responded by pointing his head towards the open driver's-side door and indicating in broken English that his license could be found in the vehicle.  Dupont pointed towards the vehicle and confirmed in broken Spanish that the license was inside.  Medina responded that Dupont could enter the vehicle and retrieve a wallet on the front passenger seat.  Dupont retrieved the wallet and opened it in front of Medina, who verbally and gesturally indicated that his license was in the left-side pocket.  Dupont removed a driver's license and various ID cards from the wallet, all in the name of Miguel Roldan.  Medina then indicated that he wanted Dupont to retrieve his paycheck from above the driver-side visor.  Dupont confirmed that Medina wanted him to retrieve items from the visor and pulled a stack of papers, including a paycheck in Roldan's name.  After examining the papers, Dupont placed them back on the driver's seat.[3]

---

[3] During his testimony, Trooper Dupont could not recall exactly when he spoke English and when he spoke broken Spanish to Medina and could not recall exactly in which language Medina responded.  However, Dupont testified that he used a mix of English and basic Spanish in communicating with Medina, that Dupont only knew a few basic words of Spanish at the time, and that he believed Medina could understand English fairly well based on his verbal and gestural responses.

With the aid of an interpreter on speakerphone, O'Leary then asked Medina several questions outside of the marked cruiser. Based on the fact that "Miguel Roldan" had previously indicated to the DMV that he was from Puerto Rico, O'Leary asked Medina questions, through the interpreter, about living in Puerto Rico and his contacts with relatives there. Among other statements, Medina claimed that he had spoken with his mother in Puerto Rico recently on the phone but did not have her telephone number. O'Leary also asked Medina to identify the number of stars on the Puerto Rican flag, which Medina was unable to do. This confirmed Trooper O'Leary's suspicions that Medina was not being truthful about his identity.

ICE Officer Anoli arrived on the scene around 3:30 p.m., at which point Medina was fingerprinted. After a five-minute wait for the fingerprint results to process, the results revealed Medina's identity.[4] O'Leary asked Anoli to read Medina the *Miranda* warnings in Spanish and Medina invoked his right to remain silent.[5] See Miranda v. Arizona, 384 U.S. 436 (1966). Medina was then arrested and placed in the back of O'Leary's cruiser. In general, the troopers testified that Medina's demeanor during the stop was calm, that he did not hesitate to answer their questions, and that he did not indicate in any way that he had any problem understanding what the troopers were saying to him or what was occurring.

Within fifteen to twenty minutes of Medina's arrest, O'Leary and Dupont performed an inventory search of Medina's vehicle pursuant to standard police department policy and seized several items of evidentiary value, including the papers and identification documents in the name

---

[4] In its brief, the Government asserts that, at some point thereafter, a Massachusetts license check revealed that Medina's privileges to operate a motor vehicle had been suspended in 2002 as a result of an arrest warrant out of Massachusetts. (Gov't Opp'n to Def.'s Mot. to Suppress (ECF No. 38), Page ID # 75.)

[5] Subsequent to the revelation of Medina's identity, but before he was given the *Miranda* warnings, Officer Anoli asked several questions that prompted incriminating statements from Medina. In addition, after he had invoked his right to remain silent, Medina made several unprompted statements to Dupont while the two men sat in the backseat of O'Leary's cruiser.

of Miguel Roldan. The vehicle was towed pursuant to department policy and Medina was transported to police barracks. As part of processing at the barracks, Medina was asked to reveal his name and date of birth via a Spanish interpreter.[6]

## II.   DISCUSSION

Medina seeks to suppress (1) statements he made before he was given the *Miranda* warnings; (2) the false identity papers seized from his vehicle; (3) the results of the fingerprinting; and (4) his answers to the booking questions at police barracks.[7] The Court considers each category of evidence and Medina's related arguments in turn.

### A.  Medina's Statements

Medina argues that he was in custody once he was handcuffed and therefore that any statements made in response to police questioning before he was given the *Miranda* warnings are inadmissible in the Government's case-in-chief. The Government contends that "anything [Medina] said prior to the discovery of his true identity was not the result of custodial interrogation and is therefore admissible." (Gov't Opp'n to Def.'s Mot. to Suppress (ECF No. 38), Page ID # 76.) Given that the troopers admittedly asked Medina questions that elicited various potentially incriminating statements, the Court must determine if Medina was in custody for purposes of *Miranda*.[8]

---

[6] Medina was later charged with using a false document in connection with a government agency, pursuant to 18 U.S.C. § 1001(a)(3); Social Security Fraud, pursuant to 42 U.S.C. § 408(a)(7)(B); Unlawful Use of Means of Identification, pursuant to 18 U.S.C. §§ 1028(a)(7) and 1028(b)(2)(B); and Aggravated Identity Theft, pursuant to 18 U.S.C. § 1028A(a)(1).

[7] At the suppression hearing, counsel for Medina clarified that he is no longer challenging the vehicle stop.

[8] The Government has represented that it does not intend to introduce any of the statements Medina made to Officer Anoli after his true identity was revealed but before he was read the *Miranda* warnings. The Government maintains that Medina's statements to Trooper Dupont in the backseat of the cruiser after he had invoked his right to remain silent were not the product of interrogation, and Medina does not appear to seek suppression of these statements.

A person temporarily detained pursuant to a traffic stop is not in custody for purposes of *Miranda*. United States v. Campbell, 741 F.3d 251, 265-66 (1st Cir. 2013). Further, an officer conducting a traffic stop "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions," Berkemer v. McCarty, 468 U.S. 420, 439 (1984), and may ask the person to exit his vehicle without converting the stop into an arrest, United States v. Fernandez, 600 F.3d 56, 59 (1st Cir. 2010). However, a traffic stop may become a "de facto arrest," which requires that a suspect be given *Miranda* warnings before being interrogated. United States v. Rabbia, 699 F.3d 85, 91 (1st Cir. 2012). Because "[t]here is no bright line that distinguishes a valid *Terry* stop from a de facto arrest," a court must consider "in light of the totality of the circumstances, whether a reasonable person in the suspect's position would have understood her position to be tantamount to being under arrest." Id. (quotation marks omitted). "Whether a *Terry* stop has escalated into a de facto arrest depends on a number of factors, including, *inter alia*, the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect." Id.; see also United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011) ("Evaluating whether the scope of an investigatory stop is reasonable demands careful consideration of the totality of the circumstances.")

Although "[o]fficers' temporary use of coercive measures, such as handcuffs . . . [is] not dispositive," United States v. Candelario-Santana, 834 F.3d 8, 18 (1st Cir. 2016), "the level of physical control officers exercise over a suspect carries the most weight in determining whether such suspect was in custody," United States v. Davis, 773 F.3d 334, 340 (1st Cir. 2014) (quotation marks omitted). In general, the use of handcuffs on a suspect is "among the most recognizable indicia of a traditional arrest." Rabbia, 699 F.3d at 93 (quotation marks omitted). Therefore, when

6

a suspect is handcuffed, the government "must be able to point to *some specific fact or circumstance* that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop *without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm*." United States v. Acosta-Colon, 157 F.3d 9, 19 (1st Cir. 1998) (emphasis altered).

The Government provides the following rationale for the handcuffing of Medina immediately after he exited his vehicle:

> O'Leary had substantial information indicating that Medina was using a false identity and had obtained a fraudulent driver's license and vehicle registration. He knew from other similar investigations that many of the individuals who had obtained false driver's licenses through [the corrupt DMV worker] were drug traffickers seeking to conceal their identities from law enforcement, while others were in the country illegally. Either way, Medina's likely use of a false identity demonstrated a substantial risk of flight. In addition, Medina's size and physical condition enhanced O'Leary's concern for his safety.

(Gov't's Opp'n to Def.'s Mot. to Suppress, Page ID # 79.) Trooper O'Leary testified at the suppression hearing that he placed Medina in handcuffs based on safety considerations because Medina was in very good shape and O'Leary was concerned about Medina's motives for apparently attempting to conceal his true identity.

The Court concludes that the Government has identified specific facts supporting a reasonable belief on O'Leary's part that handcuffing Medina was necessary to safely effectuate the investigatory stop. O'Leary's strong suspicion that Medina was operating under a false identity reasonably suggested a risk of flight and the possibility of danger to the troopers and the public. See United States v. Meadows, 571 F.3d 131, 142 (1st Cir. 2009) (stating that the risk of flight "can contribute to an officer's reasonable need to handcuff a suspect"). The fact that other persons who had obtained fraudulent driver's licenses from the corrupt DMV worker were drug traffickers supported a reasonable suspicion that Medina could be a drug trafficker and thus traveling armed.

7

See United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005) (handcuffing deemed necessary in part because the officer observed large quantities of cash in the suspect's car and knew from experience that people traveling with large amounts of drug proceeds may be armed or travel with armed escorts); see also United States v. Jones, 700 F.3d 615, 625 (1st Cir. 2012) (handcuffing was necessary because officers reasonably believed that the traffic stop involved armed drug traffickers); Rabbia, 699 F.3d at 92 (same). Finally, Medina's good physical condition reasonably supported a conclusion that handcuffing was a necessary safety precaution. See United States v. Flores, 2:16-cr-00044-JDL, 2016 WL 7378104, at *3 (D. Me. Dec. 20, 2016) (noting that a suspect's "physical size [is a] specific circumstance[] that may contribute to a reasonable belief that the officers' safety was at risk").[9]

The touchstone of the custody inquiry is "whether a reasonable person in the suspect's position would have understood her position to be tantamount to being under arrest." Rabbia, 699 F.3d at 91 (quotation marks omitted). In this case, Medina apparently remained handcuffed for approximately thirty minutes between being pulled over and being fingerprinted.[10] However, the Court concludes that the duration of Medina's handcuffing is mitigated by the fact that Troopers O'Leary and Dupont expressly informed Medina that he was not under arrest and was merely being

---

[9] Medina appeared to be strong and physically fit at the hearing almost a year after the stop, if not exactly imposing in stature. The Court notes that a gym bag, a jump rope, what the Court surmises are boxing gloves and gym clothes, a baseball bat and construction-related items were later found in Medina's vehicle, supporting the police testimony that Medina was in good physical condition at the time of the stop. (See New Hampshire State Police Possessed Property Report, Hr'g Ex. 2.)

[10] In the Court's assessment, this length of handcuffing is somewhat troubling and distinguishes this case from longer investigatory stops that did not involve the suspect being handcuffed for the duration of the stop. See, e.g., United States v. Rabbia, 699 F.3d 85, 93 (1st Cir. 2012) (noting that "[t]he relative brevity of Rabbia's detention further undermines the notion that he was de facto arrested" where he was in handcuffs for five minutes and detained for approximately thirty minutes); United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005) (determining that a thirty-minute stop was not a de facto arrest, but specifically noting that the suspect was "not handcuffed, placed in the police car, or subject to direct physical constraint"); United States v. McCarthy, 77 F.3d 522, 531-32 (1st Cir. 1996) (determining that a seventy-five minute detention was not a de facto arrest, but specifically noting that the suspect was never handcuffed).

detained. See id. at 93 ("The officers explicitly informed Rabbia that he was not under arrest, that he was being handcuffed as a safety measure and that the handcuffs would be removed when other police officers arrived, which should have clarified the circumstances to a reasonable person.").[11] For these reasons, the Court concludes that the handcuffing of Medina does not weigh in favor of finding that he was in custody before his true identity was revealed.[12]

In addition, looking to the totality of the circumstances, other factors demonstrate that Medina was not in custody. See Flowers v. Fiore, 359 F.3d 24, 31-32 (1st Cir. 2004) ("We stress again that we do not rely on any single factor as legally dispositive [of whether a stop has exceeded the scope of a *Terry* stop], but assess the cumulative impact of the various elements of the stop. We look at the total factual context of the stop, thereby following our directive to make fact-specific evaluations and inquiries of the situation as a whole.")

---

[11] Although the Rabbia court noted that the fact that the suspect was handcuffed for only five minutes "undermines the notion that he was de facto arrested," the court did not suggest that a longer period of handcuffing would be dispositive in the other direction. 699 F.3d at 93. At least one court in this Circuit has found that a suspect was de facto arrested despite being told he was not under arrest, but that case also involved the suspect being transferred to another location from the scene of the initial stop. See United States v. Ryan, 729 F. Supp. 2d 479, 488 (D. Mass. 2010) ("Therefore, despite the fact that [the officer] told defendant he was not under arrest, the combination of placing defendant in handcuffs and transporting him to the park ranger station moves the encounter from a *Terry* stop to a de facto arrest. A reasonable person would have understood that he was not free to leave." (footnote omitted)). In a recent decision, the First Circuit suggested that not specifically informing the suspect that the handcuffs are a temporary safety measure and not removing them after a certain period of time could weigh in favor of finding that a *Terry* stop had escalated into a de facto arrest. United States v. Candelario-Santana, 834 F.3d 8, 19 (1st Cir. 2016). However, the Candelario-Santana court did not decide that specific issue, and other factors were present that weighed in favor of finding a de facto arrest, including the secluded location of the stop, its indeterminate duration, and the fact that an officer pointed his weapon at the suspect and threw him on the ground. Id.

[12] This case is distinguishable from United States v. Acosta-Colon, in which the First Circuit rejected the Government's argument that handcuffing the suspect was a reasonable safety measure because he was a suspected drug dealer and therefore "could [have] be[e]n armed." 157 F.3d 9, 19 (1st Cir. 1998) (quotation marks omitted). In particular, in Acosta-Colon, it was not reasonable to believe that the suspect was armed or had ready access to weapons given that he was stopped in an airport jet bridge after passing through airport security. Id. & n.10. By contrast, Medina could have accessed a weapon in his vehicle even after being subjected to a patdown by Trooper O'Leary. Furthermore, although consideration of whether handcuffs are necessary does not appear to hinge on officer intent, the court in Acosta-Colon noted that there was no evidence that any of the officers involved "harbored an *actual* suspicion that [the suspect] was armed or otherwise presented an appreciable danger." Id. (footnotes omitted). In fact, the law enforcement officials in that case indicated they handcuffed the suspect based on compliance with airport standard operating procedures. Id. at 20 n.14. O'Leary specifically testified that he handcuffed Medina based on individualized safety concerns.

First, the fact that the stop occurred in a Friendly's parking lot in broad daylight—what some courts refer to as a "neutral location"—weighs against concluding that Medina was in custody. See Campbell, 741 F.3d at 267 (noting that "[t]he defendants were questioned in a neutral location, a hotel parking lot"); Rabbia, 699 F.3d at 93 (noting that the suspect "was stopped and detained in a parking lot abutting a busy public alleyway"); Fornia-Castillo, 408 F.3d at 65 (noting that the stop occurred on "a busy public street" (quotation marks omitted)); United States v. Maguire, 359 F.3d 71, 79 (1st Cir. 2004) (noting that the stop "occurred on a public street in the light of day").

Second, there is no indication that the troopers unreasonably prolonged the stop or took longer than necessary to assemble the information and personnel they needed to dispel their suspicions about Medina's true identity. See United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) (noting in context of fifty-minute stop that the officers "diligently pursued a means of investigation that would dispel their suspicions"); see also United States v. Mouscardy, 722 F.3d 68, 74 (1st Cir. 2013) ("In addition to the overall brevity of the stop, there is no evidence that it was unreasonably prolonged.").

Third, the number of officers on the scene—at most, five—does not weigh in favor of concluding that Medina was in custody. See United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (the presence of five officers did not weigh in favor of finding a de facto arrest); United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987) (same).

Finally, to the extent that some courts have considered the nature of the interaction between the police and the suspect, there is no evidence that the police interactions with Medina were threatening or hostile. See Campbell, 741 F.3d at 267 (noting, in determining that the suspects were not in custody, that the officers did not act with hostility towards them); Zapata, 18 F.3d at

975 (noting that the officers' "approach was measured, their words polite, their conduct not bellicose"). Nor is there any evidence that Medina acted upset or challenged the officers' actions. The Court therefore concludes, based on the totality of the circumstances, that Medina was not in custody for purposes of *Miranda* before his true identity was revealed.[13]

In addition to his argument regarding custody, Medina also argues that his statements were not voluntary based on the circumstances of the stop and his contention that he does not understand English. This argument is unavailing. Based on the same factors that lead the Court to conclude that Medina was not in custody, the Court concludes that there is no evidence of coercion, threats, or duress that would render Medina's statements involuntary. See United States v. Verdugo, 617 F.3d 565, 575-76 (1st Cir. 2010) (statements voluntary where no evidence of threats, duress, or coercion). Further, the Court credits the troopers' unrebutted testimony, based on Medina's body language, gestures, and responses, that he understood what he was being asked. The Court's conclusion that Medina possesses at least basic comprehension of the English language is also supported by evidence that the "Lima Medina" Facebook page was in English and that Medina conducted a conversation with Dupont about his family and living circumstances in English while the two men sat in the backseat of the cruiser.

For these reasons, Medina's Motion as to his statements is DENIED.

---

[13] In addition to the factors discussed, this case does not involve Medina being transported to a different location, which is often a strong signal that the suspect has been arrested. See United States v. Le, 377 F. Supp. 2d 245, 255 (D. Me. 2005) ("In this case, the detention of Defendant Dung Le has all the hallmarks of an arrest. She was ordered from the car at gunpoint, handcuffed, placed in a police cruiser, *and immediately removed from the scene to a police barracks*." (emphasis added)); see also United States v. Widi, 686 F. Supp. 2d 107, 113 (D. Me. 2010) (finding a de facto arrest where the suspect was handcuffed and transported from the scene of the initial stop in the back of a police cruiser).

In support of his position, Medina cites United States v. Newton, in which the Second Circuit essentially held that handcuffing a suspect in his home rendered the detention custodial for purposes of *Miranda*. 369 F.3d 659, 676 (2d Cir. 2004). However, the First Circuit has expressly declined to hold that handcuffing is dispositive on the custody issue. See United States v. Brame, Criminal No. 06-53-P-H, 2006 WL 2943406, at *4 (D. Me. Oct. 12, 2006) (distinguishing Newton by noting that in the First Circuit "[e]ven the placing of handcuffs on the person stopped does not necessarily convert the stop into an arrest").

### B.     Identity Documents

Although it is not entirely clear from his Motion, it appears that Medina challenges the search and eventual seizure of the identity papers in his wallet and in his vehicle. The Court concludes, based on the testimony of Trooper Dupont, that Medina clearly consented to the search of his wallet and the papers above the driver's-side visor both by telling Dupont that he could retrieve these items and by gesturally indicating their location. See United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006) (concluding that the suspect consented to the search of his nightstand when, upon being asked for his identification, he stated that his wallet was in the nightstand and indicated the nightstand with a movement of his shoulder). The Court again credits the officers' testimony that Medina's interactions with them indicated that he possesses basic proficiency in the English language to the extent that he could consent to a search. In addition, beyond Medina's consent to the initial search, the police had three independent bases for the seizure of the identity documents bearing the name of Miguel Roldan from Medina's vehicle. There was probable cause to search Medina's vehicle for evidence of the false identity offense after he was arrested. United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011). The documents could have been seized pursuant to a search incident to Medina's lawful arrest. Id. (discussing lawful vehicle searches incident to arrest for evidence of the crime of arrest). And, finally, the documents could have been seized pursuant to the subsequent, valid inventory search of the vehicle. United States v. Scott, 270 F.3d 30, 40 (1st Cir. 2001).

For these reasons, Medina's Motion as to the identity documents is DENIED.

### C.     Fingerprints and Answers to Booking Questions

At the suppression hearing, defense counsel for the first time raised challenges to the fingerprinting and to the booking questions. Although it is within this Court's discretion to not

address arguments that were not timely raised in the suppression motion, see United States v. Mancillas, 183 F.3d 682, 703-04 (7th Cir. 1999), the Court briefly addresses each claim in turn.

Regarding the fingerprinting, the Court's best understanding of Medina's position is that the fingerprints should be suppressed pursuant to Davis v. Mississippi, 394 U.S. 721 (1969), which essentially holds, for purposes of Medina's argument, that fingerprints resulting from an unlawful detention must be suppressed. Davis, which involved a suspect's unlawful detention at police headquarters, is of limited relevance to the present case. As explained above, Medina was fingerprinted during a lawful investigatory stop, and Davis does not in any way address the standard for fingerprinting a suspect during this type of detention. Indeed, there is surprisingly little clarity in the case law regarding the standards for fingerprinting a suspect during an investigatory stop. However, in Hayes v. Florida, the Supreme Court noted that "[t]here is . . . support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch." 470 U.S. 811, 817 (1985); see Kaupp v. Texas, 538 U.S. 626, 630 n.2 (2003) (citing Hayes and noting that the Court has "left open the possibility that, 'under circumscribed procedures,' a court might validly authorize a seizure on less than probable cause when the object is fingerprinting"); see also Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty., 542 U.S. 177, 188-89 (2004) (again citing the Hayes dicta with approval regarding police attempts to determine a suspect's identity during investigatory stops). Further, the First Circuit has outlined the following guidelines for determining the reasonableness of measures taken during an investigatory stop:

> [W]e look to whether the officer's investigative measures were reasonably calculated to uncover evidence of wrongdoing related to circumstances giving rise

> to the officer's initial suspicions. There is no fixed guide to what police investigative measures are within the scope of a *Terry* stop; in all events, the touchstone is the reasonableness of the measures undertaken to quell or confirm the officer's suspicions.

Klaucke v. Daly, 595 F.3d 20, 25 (1st Cir. 2010) (citations omitted). With this precedent as a guide, the Court concludes that the fingerprinting of Medina, during a lawful investigatory stop, was a reasonable measure taken to uncover evidence related to the officers' reasonable suspicions that Medina was using a false identity and was carried out with reasonable dispatch in the context of the stop. For this reason, the Court DENIES Medina's Motion as to the fingerprints.

Finally, regarding the booking questions, the Court notes that asking Medina for his name or other identifying information at the police barracks could possibly trigger *an exception to the general exception* that booking questions do not implicate *Miranda*. See, e.g., United States v. Reyes, 225 F.3d 71, 77 (1st Cir. 2000) ("[A]sking a person's name might reasonably be expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense *focused on identity* . . . .") (emphasis added). However, it appears highly unlikely that the Government would seek to admit Medina's responses to the booking questions given the admissible fingerprint evidence establishing Medina's true identity. Given this likelihood and the belated timing of Medina's booking question objection, the Court DENIES WITHOUT PREJUDICE Medina's Motion as to the booking questions with the understanding that Medina can renew his objection if the Government seeks to introduce his responses to the booking questions in their case-in-chief at trial.

## III.  CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion to Suppress. The Motion is DENIED WITHOUT PREJUDICE as to Defendant's responses to the booking questions.

SO ORDERED.

/s/ George Z. Singal  
United States District Judge

Dated this 27th day of March, 2017.